KANGAROOS U.S.A., INC., Plaintiff,

v.

CALDOR, INC., Defendant.

83 Civ. 6984 (WCC).

United States District Court,
S.D. New York.

April 27, 1984.
As Amended May 4 and May 25, 1984.

Parker, Auspitz, Neesemann & Delehanty, P.C., New York City, for plaintiff; Joseph C. Markowitz, Carroll E. Neesemann, New York City, Popkin, Stern, Heifetz, Lurie, Sheehan, Reby & Chervitz, St. Louis, Mo., of counsel.

Kenyon & Kenyon, New York City, for defendant; Philip J. McCabe, James E. Rosini, New York City, Jones, Day, Reavis & Pogue, Barry L. Springel, Robert C. Kahrl, Cleveland, Ohio, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

In this action for alleged infringement of U.S. patents No. 4,384,414 (the "the '414 patent") and No. D261,695 ("the '695 design patent") covering athletic shoes with side pockets for valuables, defendant Caldor, Inc. has moved for partial summary judgment dismissing the claim on the '414 patent on the ground of alleged fraud in the prosecution of the application therefor, and plaintiff Kangaroos U.S.A. has cross moved for partial summary judgment overruling this fraud defense.

For the reasons stated herein, defendant's motion is granted and plaintiff's cross motion is denied.

### The relevant facts

The following facts are undisputed, being based entirely upon the documentary records of proceedings in the United States Patent and Trademark Office ("PTO"):

On August 30, 1978, Robert J. Gamm ("Gamm") filed in the PTO U.S. design patent application Serial No. 938,098 ("the design application") covering an ornamental design for an "Athletic Shoe Pocket." The design application, as well as all of the other applications discussed herein, were prepared and prosecuted by Paul M. Denk of St. Louis, Missouri ("Denk"), the attorney for Envoys U.S.A., Inc. ("Envoys"), the assignee of all the applications.

In the first Official Action, mailed April 21, 1980, the PTO examiner rejected the single claim of the design application because the drawing was indefinite, incomplete and inconsistent, so that the disclosure failed to satisfy the requirements of 35 U.S.C. § 112. No response to this Official Action was filed within the three months allowed by the examiner and on July 21, 1980 the application became abandoned.

On December 26, 1979, Gamm filed in the PTO an application Serial No. 107,092 for a utility patent also entitled "Athletic Shoe Pocket" ("the parent utility application"). The specification of this application contained, in a section captioned "Cross Reference to Related Application," the following recitation:

> The subject matter of this application is related in part to the subject matter of the application of Robert J. Gamm, Serial No. 939,098 filed on August 30, 1978, and owned by a common assignee; this application comprised a continuation-in-part of said earlier application.

The parent utility application contained claims covering both flapped and unflapped flat pockets stitched on the outside quarter of an athletic shoe. In the first Official Action, mailed January 12, 1981, the examiner rejected Claims 1, 2 and 13, which were all of the claims covering pockets without flaps, as obvious over the prior Adams et al. U.S. patent No. 2,801,477 ("Adams"), which discloses a transparent pocket stitched on the outside quarter of a saddle-type oxford shoe for receiving a decorative plaque, in view of the prior Bliese U.S. patent No. 3,018,570 ("Bliese"), which discloses a shoe with a flapped purse secured to the vamp panel on top of the shoe.

**1518**

As for the remaining claims covering pockets with flaps, the examiner allowed Claims 7 through 12, and indicated that Claims 3–6 and 14–17, which were dependent on rejected claims, would be allowable if amended to place them in independent form.

In Amendment A filed October 8, 1980, Gamm cancelled Claim 1 but argued the patentability of Claims 2 and 13 over the reference patents. In the second Official Action, mailed January 12, 1981, the examiner finally rejected Claims 2 and 13, together with Claims 18 and 19, which had been substituted for Claim 1 and which likewise covered unflapped pockets. In Amendment B, filed February 17, 1981, Gamm cancelled all the rejected claims and in the next Official Action, mailed April 24, 1981, the application was indicated to be allowable. After payment of the issue fee, U.S. patent No. 4,296,559 ("the '559 patent") was issued on October 27, 1981 on this application.

On February 3, 1981 while the parent utility application was still pending, Gamm filed in the PTO a divisional application ("the divisional application") for utility patent, containing the cancelled claims 1, 2 and 13, as well as added claims covering unflapped pockets. In Amendment A filed concurrently with the divisional application, the specification was amended to add, after the above-quoted statement that the application was a continuation-in-part ("CIP") of the design application, the following recitation:

This application also comprises a division of the parent patent application upon the Athletic Shoe Pocket as filed by the inventor on December 26, 1979, having Serial No. 107,092.

In the first Official Action mailed September 14, 1981, the examiner rejected all of the claims, most of them as unpatentable under 35 U.S.C. § 103 over various prior patents including Adams and Bliese and/or a newly cited prior Gulbransen U.S. patent No. 4,280,287 ("the Gulbransen pat-

ent"). Gulbransen was issued July 28, 1981 on an application filed May 21, 1979 and discloses an athletic shoe having stitched on the outside quarter a flat pocket for valuables. The remaining claims were rejected under 35 U.S.C. § 102 as fully anticipated by the Gulbransen patent alone.

In the responsive Amendment B, filed January 21, 1982, Gamm argued that Gulbransen should be eliminated as prior art because

... the claims of this current application were divided out of a parent application having Serial No. 107,092, filed on December 26, 1979. In addition, both this divisional application and the parent application ... are both continuation-in-part applications of an earlier filed application by the same inventor upon an athletic shoe pocket, having Serial No. 938,098, as filed in the United States Patent Office on August 30, 1978. This is almost nine months prior to the filing date of the Gulbransen application.

Amendment B also amended the cross-reference section of the specification by inserting after the reference to application Serial No. 939,098, filed on August 30, 1978, the phrase "now United States patent No. 4,296,559." The reference as amended is incorrect. The identified patent was issued not on the design application Serial No. 939,098 but on the parent utility application Serial No. 107,092.

The examiner apparently accepted Gamm's claim of priority for the divisional application based upon the filing date of the 1978 design application because in subsequent Official Actions the Gulbransen patent was never again relied upon or even mentioned by the PTO.

In the "Remarks" to Amendment B, Gamm argued that the claimed invention was patentable over the prior Adams and Bliese patents because Adams does not disclose an athletic shoe but a conventional saddle oxford, and because the pocket was

not intended to contain personal items but a decorative patch and it has no zipper, Velcro or other closure means, while in Bliese the pocket is secured to the vamp panel and not the quarter of the shoe. The Gulbransen patent, which had been withdrawn as a reference following Gamm's claim of entitlement to CIP status, discloses both of these features missing in Adams and Bliese.

After considerable further prosecution which involved first substituting new claims and, after the new claims had all been rejected, amending them, submitting extensive affidavits and conducting a personal interview with the examiner, the application was indicated to be allowable in an Official Letter mailed December 10, 1982. After payment of the issue fee, the '414 patent was issued on May 24, 1983 on this application. Two weeks later, on June 7, 1983, Denk filed a certificate of correction of the '414 patent, amending the cross-reference section to read:

Division of Ser. No. 107,092, Dec. 26, 1979, Pat. No. 4,296,559, and a continuation-in-part of Ser. No. 938,098, Aug. 30, 1978, abandoned.

*The critical issue of law*

Camm's 1979 parent utility application, Serial No. 107,092 was clearly not entitled to the benefit of the filing date of his 1978 design application Serial No. 939,098 because the invention claimed in the parent utility application was not even colorably disclosed in the design application.

All of the claims of the parent utility application, as originally filed, required both (1) stitching of the upper edge of the pocket to the quarter portion of the shoe "approximately along the eyestay" through which the laces pass and (2) "zipper means" for closing the pocket. All of the claims which at any time thereafter were presented in the application contained either one or both of these two limitations.

The design application discloses neither of these features. In the only shoe shown in the drawings of that application, the pocket is closed by a flap whose upper edge is stitched not along the eyestay but along the upper edge of the shoe directly beneath the wearer's ankle. No zipper means is shown; instead, the flap, which is shown only in closed position, is secured by what appears to be a snap of the type commonly used on coin purses.

Entitlement to the benefit of the filing date of an earlier application is governed by 35 U.S.C. § 120, which provides:

An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States ... by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of a termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.

It is well settled that:

Under 35 U.S.C. § 120, an applicant is entitled to claim the benefit of the filing date of an earlier application for a later-claimed invention only when that earlier application discloses that invention in the manner required by 35 U.S.C. § 112 first paragraph. *In re Berkman*, 642 F.2d 427, 429 (C.C.P.A.1981).

The first paragraph of 35 U.S.C. § 112 requires that:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

It is clear beyond the slightest question that the invention claimed in Gamm's parent utility application was not disclosed in his earlier design application in the manner required by 35 U.S.C. § 112. As explained above, the design application does not show or suggest either of two features of which one or both are called for in every one of the claims ever presented in the parent utility application. Thus the latter application was clearly not entitled under 35 U.S.C. § 120 to the benefit of the filing date of the design application. *In re Berkman, supra,* 642 F.2d 427 at 429.

Plaintiff does not now contend otherwise, but instead merely argues that no fraud was committed on the PTO because (1) Gamm was entitled by the Manual of Patent Examining Procedure ("MPEP") to make a formal claim to CIP status for the parent utility application; (2) the PTO was furnished all of the information necessary to determine for itself the validity of that claim; and (3) the MPEP imposes on the PTO the duty to make such a determination.

Plaintiff's first premise is at least unpersuasive if not downright disingenuous. Plaintiff bases the assertion that Gamm was entitled to claim CIP status for the parent utility application upon the following quotation from Section 201.08 of the MPEP:

[A]n alleged continuation-in-part application should be permitted to claim the benefit of the filing date of an earlier application if the alleged continuation-in-part application complies with the following formal requirements of 35 U.S.C. § 120;

1. The first application and the alleged continuing application were filed "by the same inventor";

2. The alleged continuing application was "filed before the patenting or abandonment of or termination of proceedings on the first application or an application similarly entitled to the benefit of the filing date of the first application"; and

3. The alleged continuing application "contains or is amended to contain a specific reference to the earlier filed application."

This quotation is grossly out of context. In the first word "[A]n" of the quotation the "A" has been capitalized and placed in brackets because the preceding word "Accordingly" has been omitted. The preceding sentence of the original text, which forms the antecedent basis for the conclusion stated in the quoted portion, reads:

Unless the filing date of the earlier application is actually needed, for example, in the case of an interference or to overcome a reference, there is no need to make a determination as to whether the requirement of 35 U.S.C. 120, that the earlier application disclose the invention of the second application in the manner provided by the first paragraph of 35 U.S.C. 112, is met and whether a substantial portion or all of the earlier application is repeated in the second application in a continuation-in-part situation.

It is therefore clear that Section 201.08 was intended merely to provide that *if* the filing date of the earlier application is *not needed, e.g.,* to overcome a reference, an applicant should be permitted to make a claim of CIP status for an application provided the three formal requirements stated in the terminal portion of 35 U.S.C. § 120 are met—in other words, without the necessity for the examiner to determine whether the fourth requirement of § 120 is met—*i.e.,* whether the disclosure of the earlier application adequately supports the claims of the asserted CIP.

Section 201.08 clearly does not apply to Gamm's claim of CIP status for the parent utility application because the earlier filing date of the design application *was needed* to overcome the Gulbransen reference.

In any event, plaintiff's argument that Gamm was entitled to make a formal claim of CIP status misses the real point. Gamm did more than make a formal claim of CIP

status for the parent utility application; he argued that because the utility applications were entitled to the benefit of the filing date of the earlier design application, Gulbransen should be withdrawn as a reference in considering the patentability of the claims of the utility applications. This despite the fact that the design application did not contain even a colorable disclosure of two elements called for in the claims of the utility applications.

Plaintiff attempts to excuse Gamm's misplaced reliance on the earlier application by pointing out the undisputed facts that the PTO examiner had available to him all of the information necessary to determine whether the disclosure of the design application adequately supported the claims of the utility applications, and had the duty of making such a determination before withdrawing Gulbransen as a reference. However, it is obvious now and must have been equally obvious to Denk at the time, that such a determination was somehow omitted in this instance.

That this inexplicable lapse on the part of the examiner affected the prosecution of the divisional utility application is equally clear. Gulbransen is plainly the most pertinent prior patent cited during prosecution of either of the utility applications. It is the only prior patent which discloses a flat pocket for valuables attached on the outside quarter of an athletic shoe. It is also the only reference in which the upper edge of the pocket is secured to the shoe by stitching which runs "approximately along the eyestay," as called for in Gamm's claims. Moreover, Gulbransen discloses in his specification at Column 1, lines 49 *et seq.* that his closure flap has closure means which "may include a zipper, Velcro (hook and pile closure), snaps, buttons, or any other means which serves this function."

Thus Gulbransen discloses the very elements which Gamm emphasized were missing from the other principal references, Adams and Bliese. And Gulbransen was the only reference relied on by the PTO under 35 U.S.C. § 102 as a complete anticipation of any of Gamm's claims.

Defendant makes much of Denk's error in amending the divisional application to state that the application Serial No. 939,098 (the design application) is "now United States patent No. 4,296,559." A cynical analyst might suspect that this was not an inadvertent error but was done intentionally in order to mislead the PTO into assuming that the application Serial No. 939,098 was for a utility patent rather than a design patent, because a utility application would more likely contain an adequate disclosure of the utility invention claimed in the asserted CIP applications. However, it appears more probable that this was merely a clerical error—that Denk really intended to direct that the added matter should be inserted after the reference to the parent utility application was not contained in the divisional application itself (which was merely a duplicate of the parent utility application) but had been added by Amendment A filed simultaneously with the divisional application. Thus one looking at the cross reference section of the divisional application to determine where to add the number of the issued patent would see only the reference to application Serial No. 939,-098 and might well assume incorrectly that this was the serial number of the parent utility application rather than that of the design application.

Defendant has thus failed to establish by the necessary clear and convincing evidence that there was any intent to mislead the PTO through this erroneous reference, particularly since there was no significant advantage to be gained by doing so.

Thus the critical legal issue in the case comes down to this: whether the making of a clearly improper claim that a later application is entitled to the benefit of the filing date of an earlier application, in order to overcome the most pertinent prior art reference against the later application, which the PTO examiner could and should have checked but obviously did not, constitutes

fraud or inequitable conduct which renders the patent issued on the later application invalid or unenforceable.

*The applicable law*

■ Because of limitations on the time and facilities available to the PTO to search for prior art relevant to pending applications for patent, or to conduct tests to check assertions of efficacy or superiority, the PTO must rely heavily on the representations of patent applicants. The Supreme Court has ruled that every patent applicant therefore has an "uncompromising duty" to report to the PTO all facts affecting the patentability of the inventions claimed, to assure that "patent monopolies spring from backgrounds free of fraud or other inequitable conduct." *Precision Instrument Mfg. Co., et al. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 816, 65 S.Ct. 993, 998, 89 L.Ed. 1381, *petition for clarification denied*, 325 U.S. 843, 65 S.Ct. 1561, 89 L.Ed. 1967 (1945), *rehearing denied*, 325 U.S. 893, 65 S.Ct. 1189, 89 L.Ed. 2005 (1945); *Xerox Corp. v. Dennison Mfg. Co.*, 322 F.Supp. 963, 968 (S.D.N.Y.1971) (Mansfield, J.).

■ As the Court of Customs and Patent Appeals stated in *Norton v. Curtiss*, 433 F.2d 779, 793–94, 57 CCPA 1384 (1970):

> The ex parte prosecution and examination of a patent application must not be considered as an adversary proceeding and should not be limited to the standards required in inter partes proceedings. With the seemingly ever-increasing number of applications before it, the Patent Office has a tremendous burden. While being a factfinding as well as an adjudicatory agency, it is necessarily limited in the time permitted to ascertain the facts necessary to adjudge the patentable merits of each application. In addition, it has no testing facilities of its own. Clearly, it must rely on applicants for many of the facts upon which its decisions are based. The highest standards of honesty and candor on the part

of applicants in presenting such facts to the office are thus necessary elements in a working patent system. We would go so far as to say they are essential. It follows, therefore, that we do approve of the indicated expansion of the types of misconduct for which applicants will be penalized.

■ Patent applicants accordingly must show "the highest degree of candor and good faith." *Kingsland v. Dorsey*, 338 U.S. 318, 319, 70 S.Ct. 123, 124, 94 L.Ed. 123 (1949), *rehearing denied*, 338 U.S. 939, 70 S.Ct. 341, 94 L.Ed. 579 (1950). They stand "before the Patent Office in a confidential relationship and [owe] the obligation of frank and truthful disclosure." *Charles Pfizer & Co. v. F.T.C.*, 401 F.2d 574, 579 (6th Cir.1968). "[O]ur patent system could not function successfully if applicants were allowed to approach the Patent Office as an arm's length adversary." *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 428 F.2d 555, 565 (5th Cir.1970). This duty of candor rests equally on the applicant and his attorney. 37 C.F.R. § 1.56(a).

■ A patent obtained by fraud on the PTO is invalid, *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 251, 64 S.Ct. 997, 1003, 88 L.Ed. 1250 (1943), while unclean hands or inequitable conduct in the prosecution of a patent application renders the resulting patent unenforceable. *Precision Instrument Mfg. Co., et al. v. Automotive Maintenance Machinery Co., supra*, 324 U.S. at 814–15, 65 S.Ct. at 997–98:

> The guiding doctrine in this case is the equitable maxim that "he who comes into equity must come with clean hands." This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical

concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be "the abettor of iniquity." *Bein v. Heath* [47 U.S. 228, 247] 6 How. 228, 247 [12 L.Ed. 416 (1800)]. Thus while "equity does not demand that its suitors shall have led blameless lives," *Loughran v. Loughran*, 292 U.S. 216, 229 [54 S.Ct. 684, 689, 78 L.Ed. 1219 (1934)], as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue. *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 [54 S.Ct. 146, 147, 78 L.Ed. 293 (1933)]; *Johnson v. Yellow Cab Co.*, 321 U.S. 383, 387 [64 S.Ct. 622, 624, 88 L.Ed. 814 (1944)]; 2 Pomeroy, Equity Jurisprudence (5th Ed.) §§ 379–399.

Although some courts have heretofore questioned the practicality of the distinction between fraud which renders a patent invalid and inequitable conduct which renders it unenforceable, *Timely Products Corp. v. Arron*, 523 F.2d 288, 297–98 (2d Cir.1975); *In re Multidistrict Litigation Involving Frost Patent*, 398 F.Supp. 1353, 1367–68 (D.Del.1975), *modified, other grounds*, 540 F.2d 601 (3rd Cir.1976), recent decisions have recognized at least two significant differences:

For example, in *Connell v. Sears Roebuck & Co.*, 722 F.2d 1542, 220 U.S.P.Q. 193, 200 n. 1 (C.A.Fed.1983), Chief Judge Markey stated:

Patents held unenforceable can become enforceable upon discontinuance of the conduct which led to the holding. Fraud on the PTO may result in a holding of invalidity, the equivalent of permanent nonenforceability.

And in *Warner-Jenkinson Co. v. Allied Chemical Corp.*, 477 F.Supp. 371, 394 n. 86 (S.D.N.Y.1979) *aff'd without opinion*, 633 F.2d 208 (2d Cir.1980), Judge Weinfeld of this Court observed:

A declaration of "unenforceability" of the patents in suit would not prejudice defendants' ability to reapply to the Patent Office and acquire a new patent; a declaration of invalidity would preclude reapplication.

Thus in *Application of Clark*, 522 F.2d 623 (C.C.P.A.1975), the Court of Customs and Patent Appeals ruled that a patentee who, during prosecution of the application for his original patent, had knowingly withheld from the PTO knowledge of prior art more relevant than that cited against the application, could not cure the defect by obtaining a reissue of the patent under 35 U.S.C. § 251:

Reissue is not available to rescue a patentee who had presented claims limited to avoid particular prior art and then had failed to disclose that prior art (the examiner not having cited it) after that failure to disclose has resulted in the invalidating of the claims. The sole goal of appellant in soliciting a reissue is to have the examiner re-examine his claims in light of the reference he originally failed to disclose in order, apparently, to relieve him of the consequences of his failure. While this court has often said that § 251 is to be liberally construed as a remedial statute, *In re Oda*, 443 F.2d 1200, 58 CCPA 1353 (1971), we do not feel that such liberalism extends to eradication of a dereliction of a duty by what is, in effect, a re-prosecution in which the examiner is now given an opportunity to pass on patentability in light of a very pertinent reference which the applicant knowingly withheld from him. We cannot equate this with "error," or with "inadvertance, accident, or mistake."

See also *Digital Equipment Corp. v. Diamond*, 653 F.2d 701 (1st Cir.1981), (action for review of rejection by PTO of application for reissue of patent on ground that original patent was obtained by fraud).

Moreover, where a patent is obtained by fraud, an attempt to enforce it may violate Section 2 of the Sherman Act, 15 U.S.C. § 2, provided the other requirements of a Section 2 claim are made out, *Walker Process Equipment, Inc. v. Food Machinery*

& Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), while it is generally recognized that lesser improprieties, not amounting to "intentional fraud," will not support an antitrust claim. Id. at 176, 86 S.Ct. at 349; United States Movidyn Corp. v. Hercules, Inc., 388 F.Supp. 1146 (D.Minn.1975); Patent Law Perspectives (2d Ed.) § 17.2[2] at p. 17–57, § 17.3.

■ Either fraud or inequitable conduct must be proved by clear, unequivocal and convincing evidence and the party asserting it carries a heavy burden of persuasion. Rohm & Haas Co. v. Crystal Chemical Co., 722 F.2d 1556, 220 U.S.P.Q. 289, 302 (C.A.Fed.1983); Kansas Jack, Inc. v. Kuhn, 719 F.2d 1144, 219 U.S.P.Q. 857, 861 (C.A.Fed.1983); Norton v. Curtiss, 433 F.2d 779, 797, 57 CCPA 1384 (1970).

While the establishment of classical common law fraud requires proof of the five essential elements of falsity, materiality, intent to deceive or at least recklessness, reliance and injury, the courts have been less demanding where fraud on the PTO or its lesser homolog, unclean hands, is asserted as an equitable defense to an action for patent infringement.

As explained in Norton v. Curtiss, supra, 433 F.2d at 793:

Conduct constituting what has been called earlier "technical fraud" will, of course, always be recognized as a defense. However, in these situations, failure, for one reason or another, to satisfy all the elements of the technical offense often will not necessarily result in a holding of "no fraud." Rather the courts appear to look at the equities of the particular case and determine whether the conduct before them—which might have been admittedly less than fraudulent in the technical sense—was still so reprehensible as to justify the court's refusing to enforce the rights of the party guilty of such conduct. It might be said that in such instances the concept of fraud becomes intermingled with the equitable doctrine of "unclean hands." A court might still evaluate the evidence in light of the traditional elements of tech-

nical fraud, but will now include a broader range of conduct within each of those elements, giving consideration to the equities involved in the particular case.

\* \* \* \* \* \*

Thus, in suits involving patents, today, the concept of "fraud" on the Patent Office (at least where a patentee's conduct pertaining to the relative merits of his invention is concerned), encompasses not only that which we have earlier termed "technical" fraud, but also a wider range of "inequitable" conduct found to justify holding a patent unenforceable. The courts differ as to the conduct they will recognize as being sufficiently reprehensible so as to carry with it the consequences of technical fraud. Nevertheless, one factor stands clear: the courts have become more critical in their interpretation of the relationship existing between applicants for patent and the Patent Office and their scrutiny of the conduct of applicants in light of that relationship. Not unlike those appearing before other administrative agencies, applicants before the Patent Office are being held to a relationship of confidence and trust to that agency. The indicated expansion of the concept of "fraud" manifests an attempt by the courts to make this relationship meaningful.

■ For example, it is well settled that an affirmative misrepresentation is not required; merely withholding of information material to the issue of patentability, such as known prior art more relevant to the claimed invention than that cited by the PTO or unfavorable test results, can constitute fraud or inequitable conduct barring enforcement of the patent. See, e.g., Precision Instrument Mfg. Co. v. Automotive Machine Co., supra; Norton v. Curtiss, supra.

Insofar as the materiality element is concerned, courts have on various occasions required different levels of materiality:

(1) an objective "but for" standard, which requires a showing that the patent

could not have issued "but for" the misrepresentation or concealment;

(2) a *subjective* "but for" standard, which requires a showing that the PTO examiner would not have allowed the application if he or she had known the facts in question (the testimony of the examiner is, of course, highly relevant if not necessary to such a determination);

(3) a "might have" standard, which requires merely a showing that the facts might reasonably have affected the examiner's decision as to patentability. *Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc.*, 607 F.2d 885, 899 (10th Cir.1979), *cert. denied*, 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980); *Norton v. Curtiss, supra*, 433 F.2d at 795–96, *In re Multidistrict Litigation Involving Frost Patent*, 398 F.Supp. 1353, 1368; Patent Law Perspectives (2d Ed.), § 17.2[5].

Most authorities who have discussed the matter in recent years have favored the least onerous "might have" standard, particularly where the defense is not invalidity due to fraud but unenforceability due to inequitable conduct. Patent Law Perspectives (2d Ed.) § 17.2[2], pp. 17–38 *et seq.*

Thus in *Digital Equipment Corp. v. Diamond*, 653 F.2d 701, 716 (1st Cir.1981), the Court of Appeals for the First Circuit stated:

> This is not to say that a strict "but for" test of materiality must be applied in every instance, or that it would necessarily be inappropriate to test the materiality of misrepresentations or nondisclosures against a standard somewhat different from the formulation used in *Norton.* See *True Temper Corp. v. CF & I Steel Corp.*, 601 F.2d 495, 504 (10th Cir. 1979); *In re Multidistrict Litigation Involving Frost Patent*, 540 F.2d 601, 604 n. 9 (3d Cir.1976); *Timely Products Corp. v. Arron*, 523 F.2d 288, 297–98 (2d Cir.1975). Questions of "materiality" and "culpability" are often interrelated and intertwined, so that a lesser showing of the materiality of withheld information may suffice when an intentional scheme to defraud is established, where-

as a greater showing of the materiality of withheld information would necessarily create an inference that its nondisclosure was "wrongful." *See United States v. Standard Electric Time Co.*, 155 F.Supp. 949, 952–53 (D.Mass.1957). To establish fraud, however, the nondisclosed information must be such as to have a likely effect on the scope of allowable claims or the issuance of the patent. It is not enough that the information be simply "relevant" in some general sense to the subject matter of the claimed invention, or even to the invention's patentability.

And in *Pfizer, Inc. v. International Rectifier Corp.*, 186 U.S.P.Q. 511, 515 (D.Minn. 1975), *rev'd on other grounds*, 538 F.2d 180, 186 (8th Cir.1976), the Court stated:

> The requirement of absolute candor and full and complete disclosure in prosecuting patent applications precludes the withholding of "material" prior art, facts and beliefs from, as well as the affirmative misrepresentation of "material" prior art, facts and beliefs to, the Patent Office. *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 428 F.2d 555, 165 U.S.P.Q. 355 (5th Cir.1970); *Monsanto Company v. Rohm & Haas Company, supra* [456 F.2d 592 (3rd Cir.1972)].

> \* \* \* \* \* \*

> "Materiality" under *Beckman* and *Monsanto, supra*, does not require that the patent would not have issued as a matter of law "but for" the misrepresentation or concealment, but only that the misrepresentation or withholding be relevant to an issue of patentability. *Corning Glass Works v. Anchor Hocking Glass Corp.*, 253 F.Supp. 461 (D.Del. 1966), *rev'd on other grounds*, 374 F.2d 473 (3rd Cir.1967), *cert. denied*, 389 U.S. 826, 88 S.Ct. 65, 19 L.Ed.2d 80 (1967); *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., supra* [407 F.2d 288 (9th Cir.1969)]; *SCM Corp. v. Radio Corporation of America*, 318 F.Supp. 433 (S.D.N.Y.1970); *CPC International, Inc. v. Standard Brands Inc.*, 385 F.Supp. 1057 (D.Del.1974);

*United States Movidyn Corp. v. Hercules Incorporated,* 388 F.Supp. 1146 (D.Minn.1975).

In most of these cases the testimony of the Examiner was unavailable; thus, the Courts have adopted the rule that even if the applicant misrepresents or withholds facts which are not material in a "but for" sense, the Courts will refuse to enforce the patent if the applicant has misrepresented to the Patent Office facts which may be relevant to an issue of patentability.

As explained in *Norton v. Curtiss, supra,* 433 F.2d at 795–96:

Findings of materiality should not be limited only to those situations where there can be no dispute that the true facts, or the complete facts, if they had been known, would most likely have prevented the allowance of the particular claims at issue or alternatively, would provide a basis for holding those claims invalid. In such cases, the claims at issue would probably be invalid, in any event, because of the *existence* of those facts, *in and of themselves.* Whether the claims would also be unenforceable because a fraud was committed in misrepresenting the facts to the Patent Office would really be of secondary importance. (Emphasis in original.)

In the very recent decision in *American Hoist & Derrick Co. v. Sowa & Sons, Inc., supra,* 725 F.2d 1350, 220 U.S.P.Q. at 772–73 (C.A.Fed.1984), the Federal Circuit Court, speaking through Judge Rich, recognized that the "might have" standard is "strikingly similar" to that imposed by PTO Rule 1.56(a) but concluded that, while it was a good "starting point" for determining the fraud issue, it was not carved in stone because, as the Court of Appeals for the First Circuit had previously noted, the required degree of materiality and the level of culpability are interdependent:

The PTO "standard" is an appropriate starting point for any discussion of materiality, for it appears to be the broadest, thus encompassing the others, and because that materiality boundary most closely aligns with how one ought to conduct business with the PTO. There is no reason, however, to be bound by any single standard, for the answer to any inquiry into fraud in the PTO does not begin and end with materiality, nor can materiality be said to be unconnected to other considerations:

Questions of "materiality" and "culpability" are often interrelated and intertwined, so that a lesser showing of the materiality of the withheld information may suffice when an intentional scheme to defraud is established, whereas a greater showing of the materiality of withheld information would necessarily create an inference that its non-disclosure was "wrongful." [*Digital Equipment Corp. v. Diamond,* supra at 716, 210 U.S.P.Q. at 538.]

Thus, for example, where an objective "but for" inquiry is satisfied under the appropriate standard of proof, and although one is not necessarily grossly negligent in failing to anticipate judicial resolution of validity, a lesser showing of facts from which intent can be inferred may be sufficient to justify holding the patent invalid or unenforceable, in whole or in part. Conversely, where it is demonstrated that a reasonable examiner would merely have considered particular information to be important but not crucial to his decision not to reject, a showing of facts which would indicate something more than gross negligence or recklessness may be required, and good faith judgment or honest mistake might well be a sufficient defense.

Insofar as the element of intent or *scienter* is concerned, because of the impracticality of proving the actual state of mind of the applicant or his attorney, courts have generally accepted evidence of gross negligence—for example, evidence that the applicant or his attorney knew the facts and must have realized that their disclosure to the PTO would significantly affect the examiner's decision as to patentability. As stated in *Norton v. Curtiss, supra,* 433 F.2d at 796:

The state of mind of the one making the representations is probably the most important of the elements to be considered in determining the existence of "fraud."

Perhaps it is most of all in the traditional element of "scienter" that the existence of a fiduciary-like duty should have its effect. As we have already indicated, the procurement of a patent involves the public interest, not only in regard to the subject matter of the patent grant, but also in the system under which that grant is obtained. Conduct in this area necessarily must be judged with that interest always taken into account and objective standards applied. Good faith and subjective intent, while they are to be considered, should not *necessarily* be made controlling. Under ordinary circumstances, the *fact* of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent. Where public policy demands a complete and accurate disclosure it may suffice to show nothing more than that the misrepresentations were made in an atmosphere of gross negligence as to their truth. (Emphasis in original.) The intent element of fraud, however, may be proven by a showing of acts the natural consequences of which are presumably intended by the actor. Statements made with gross negligence as to their truth may establish such intent. *Norton,* 433 F.2d at 795–96, 167 U.S.P.Q. at 545. The duty of candor owed the PTO being uncompromising, it would deal a deathblow to that duty if direct proof of wrongful intent were required.

      \*      \*      \*      \*      \*      \*

Where one who knew, or should have known, that a piece of prior art, or other information, would be material, i.e., important to the PTO in making its decision, a failure to disclose that art or information can be sufficient proof that a wrongful intent existed to mislead the PTO, and may result in a finding of what has come to be called "fraud" on the PTO. The fact finder, however, must determine not only that the undisclosed art or information was material, but that the one charged with nondisclosure knew or should have known of its materiality at the time.

*Kansas Jack, Inc. v. Kuhn, supra,* 719 F.2d at 1152, 219 U.S.P.Q. at 861, 862.

However, simple negligence or error in judgment is not sufficient. The courts have uniformly required an element of misconduct which is either willful or so seriously negligent as to support an inference of bad faith.

> ... [A]n intentional scheme of deception is not necessary to a showing of "fraud on the Patent Office." Nevertheless a not insubstantial degree of "wrongfulness" *is* required to be shown. Applicants for patents do not engage in fraudulent conduct when they make "honest mistakes in judgment" concerning the information material to consideration of their applications, nor does some slight deviation from the requisite standard of care suffice as evidence of fraud. *Digital Equipment Corp. v. Diamond, supra,* 653 F.2d at 715.

> Although the type of misconduct before the Patent Office which results in the invalidity of a patent admits to no fixed parameters, it is necessary that there be some element of wrongfulness, willfulness, or bad faith .... Hence mere negligent omissions or misstatements to the Patent Office do not provide sufficient basis for a finding of fraud .... *Parker v. Motorola, Inc.,* 524 F.2d 518, 535 (5th Cir.1975), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976) (citations omitted).

See also *Pfizer, Inc. v. International Rectifier Corp., supra,* 538 F.2d 180, 186 (8th Cir.1976).

In decisions concerning alleged fraud or equitable conduct in the prosecution of a patent application, the element of reliance by the PTO is generally not specifically discussed, but is subsumed in the consideration of materiality. If the information misrepresented or withheld reasonably "might have" affected the examiner's decision on patentability, proof of his actual reliance thereon is not required, since this would be tantamount to imposing a "subjective but for" standard of materiality, which, as noted above, few if any modern courts would do.

Likewise, the element of injury may be assumed if the other requirements are satisfied. As stated in *Norton v. Curtiss, supra,* 433 F.2d at 796:

> With regard to the element of injury, we need only repeat the words of the Supreme Court:
>
> > A patent by its very nature is affected with a public interest. * * * The far reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope.
>
> *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Where fraud is committed, injury to the public through a weakening of the Patent System is manifest.

Of course, where, as here, the fraud or inequitable conduct defense is raised in a motion for summary judgment, the motion may be granted only if it is clear that no genuine issue of material fact exists. *Pfizer, Inc. v. International Rectifier Corp., supra,* 538 F.2d at 185; *Xerox Corp. v. Dennison Mfg. Co., supra,* 322 F.Supp. at 966–67. But this barrier is not an insurmountable one in the rare case, such as the present, in which the relevant facts are clearly established by an incontrovertible documentary record. As the Court of Appeals for the Federal Circuit recently stated:

> Where no issue of material fact is present, however, courts should not hesitate to avoid an unnecessary trial by proceeding under Fed.R.Civ.P. 56 without regard to the particular type of suit involved. *Chore-Time Equipment, Inc. v. Cumberland Corp.,* 713 F.2d 774, 778–79 (C.A.Fed.1983). See also *Union Carbide Corp. v. American Can Co.,* 724 F.2d 1567 at 1571 (C.A.Fed.1984).

*Discussion*

■ Here there is no question that Gamm's claim that his later utility applica-tions were entitled to the benefit of the filing date of his earlier design application was incorrect. Under 35 U.S.C. § 120, the later applications were not entitled to the benefit of the filing date of the earlier application, unless the inventions claimed in the later applications were disclosed in the earlier application in the manner required by 35 U.S.C. § 112, which they clearly were not.

Nor can there be any doubt as to the materiality of this improper claim. It resulted in the withdrawal of the Gulbransen patent, which was clearly the most pertinent reference because it disclosed the very features which Denk emphasized were missing from the remaining references, and because it was the only reference cited under 35 U.S.C. § 102 as a complete anticipation of any of the claims. There is serious doubt whether any of Gamm's claims would have been allowed "but for" the withdrawal of Gulbransen as a reference. But it is certain that Gulbransen "might have" caused rejection of some or all of Gamm's claims or, at the very least, substantial narrowing of their scope.

Thus the only question left for determination is whether Gamm's attorney Denk knew that the claim to the benefit of the earlier filing date was improper, or was grossly negligent in failing to know it.

While the Court must be chary of applying a label of fraud or inequitable conduct, with its awful stigma and serious penalties, to any prosecutorial error which might reasonably have resulted from mere inadvertence, mistake or simple negligence, particularly on the sole basis of a cold documentary record, the inference in this case that Denk knew his claim of entitlement to the earlier filing date was improper is virtually inescapable.

In light of Denk's capable prosecution of the Gamm applications, it seems impossible to believe that he was unaware of the provision of 35 U.S.C. § 120 that a later application is entitled to the benefit of the filing date of an earlier application only if the invention claimed in the later applications was disclosed in the earlier design

application. It appears equally improbable that Denk could have thought that Gamm's utility claims, containing such express requirements as a zipper closure and stitching "substantially along the eyestay" were adequately supported by the earlier design application, whose entire disclosure consisted of drawings showing an altogether different construction.

Denk would certainly have been justified in assuming that the PTO Examiner, before withdrawing Gulbransen as a reference, would discharge his duty to examine the earlier design application to determine whether it disclosed the invention claimed in the utility applications. But, when Gulbransen was withdrawn as a reference, it must have been obvious to Denk that the examiner had for some reason failed to perform that check.

The fact that the examiner had available to him the earlier design application and had the duty of inspecting it to determine whether its disclosure adequately supported the claims of the later utility applications, did not free the attorney from his good faith obligation not to make a groundless claim that the utility applications were entitled to the benefit of the filing date of the design application.

In *Armour & Co. v. Swift & Co.*, 466 F.2d 767 (7th Cir.1972), the court rejected the patentee's argument that the information which he withheld from the PTO was already known to the examiner through his handling of a related application, stating

> The suggestion that the examiner was in fact correctly informed because he is the individual who ultimately allowed the Wilcox patent to issue is not persuasive. The Wilcox notice of allowance was not signed until November of 1968, more than two years after the Hansen patent issued. Moreover, we find nothing in the portion of the Wilcox file wrapper which is in the record to direct the examiner's attention to the significance of the fact that Wilcox worked with post-rigor meat; that fact does not appear to have been mentioned in the Wilcox application. In any event, we think that it is unfair to a busy examiner, no matter how diligent

and well informed he may be, to assume that he retains details of every pending file in his mind when he is reviewing a particular application. Especially since Patent Office proceedings are ex parte, the applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent. Armour failed to discharge that burden.

In *Kahn v. Dynamics Corp. of America*, 367 F.Supp. 63 (S.D.N.Y.1973), *affirmed* 508 F.2d 939 (2d Cir.1974), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975), this Court ruled a patent invalid because, *inter alia*, the patentee in his arguments to the PTO materially misrepresented the disclosure of the principal prior art reference relied on by the examiner, although the examiner clearly had access to the reference and the duty to check the accuracy of the applicant's statements about it.

Here Denk capitalized on the examiner's failure to check the design application by ignoring Gulbransen thereafter and directing his fire at the prior Adams and Bliese patents, which were "sitting ducks," clearly lacking, as Denk was able to point out, features called for in Gamm's claims—features which were clearly shown in Gulbransen.

While it is possible that, even if Gulbransen had not been withdrawn, the PTO would have allowed *some*, possibly much narrower, claims in the application for the '414 patent, it is certain that the application should not have been allowed without the examiner's having the opportunity to consider the effect of Gulbransen on the patentability of the claims. Denk surely knew this, and his improper elimination of Gulbransen as a reference clearly violated his "uncompromising duty" to exhibit, in his dealings with the PTO, the "highest degree of candor and good faith." At the least, there was inequitable conduct in the prosecution of the application for the '414 patent barring its enforcement in this action.

It is inconceivable that any evidence which might be adduced at a trial could

alter this conclusion. In these unusual circumstances, a partial summary judgment is appropriate.

It should be emphasized that this Court would not deny enforcement of a patent merely because it was obtained by aggressive prosecution, exaggeration or puffery, provided there is any colorable basis for the representations and contentions made on behalf of the applicant. It would do so only where, as here, a claim has been made which is so utterly devoid of merit that it could have resulted only from an intent to mislead or at least gross negligence. Such clearly groundless claims cannot be condoned merely because the PTO examiner has the duty to check them.

Defendant's motion for a partial summary judgment dismissing the claim for alleged infringement of the '414 patent is granted. It follows that plaintiff's cross motion overruling the fraud defense as to that patent is denied.

SO ORDERED.